GARY M. RESTAINO
United States Attorney
District of Arizona
Matthew Williams
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice
Shane Butland
Trial Attorney
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. |
|---|---|
| Plaintiff, | **A M E N D E D**<br>**I N F O R M A T I O N** |
| vs. | VIOS: 18 U.S.C. § 1349<br>(Conspiracy to Commit Health Care Fraud)<br>Count 1 |
| Daylon Bennett, | |
| Defendant. | 18 U.S.C. § 371<br>(Conspiracy to Defraud the United States and to Solicit and Receive Kickbacks)<br>Count 2 |
| | 18 U.S.C. § 981(a)(1)(C);<br>18 U.S.C. § 982(a)(7)<br>28 U.S.C. § 2461;<br>(Forfeiture Allegations) |

THE UNITED STATES ATTORNEY'S OFFICE CHARGES:

## BACKGROUND

At all times relevant to this Information:

**The Defendant and Related Individuals and Entities**

1. Defendant DAYLON BENNETT was a resident of Phoenix, Arizona. From in or around July 2023, through in or around August 2023, DAYLON BENNETT was a sales representative for Apex Medical LLC ("Apex"). From in or around September 2023, through in and around April 2024, DAYLON BENNETT was the Director of Sales for Apex and Viking Medical Consultants LLC (d/b/a "Viking Medical Marketing LLC") ("Viking").

2. Alexandra Gehrke was a resident of Phoenix, Arizona. Gehrke co-owned, controlled, and operated Apex and served as its Chief Executive Officer. Alexandra Gehrke solely owned, controlled, and operated Viking.

3. Jeffrey King was a resident of Phoenix, Arizona. King was a sales representative for Apex. Jeffrey King was also a co-owner and managing partner of APX Mobile Medical LLC ("APX").

4. Company 1 was a limited liability company formed under the laws of Texas, with its principal place of business in Fort Worth, Texas. Company 1 was a wholesale distributor of various amniotic wound allografts. Medicare reimbursed claims for allografts distributed by Company 1 at an extremely high rate, exceeding $1,000 per square centimeter for certain allografts.

5. APX was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. APX was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for the furnishing of allografts purchased from Company 1.

6. Apex was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Apex also referred patients to enrolled Medicare providers, including APX, for the furnishing of allografts purchased from Company 1.

7. Viking was a limited liability company formed under the laws of Arizona,

with its principal place of business in Phoenix, Arizona. Viking arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Viking also referred patients to enrolled Medicare providers, including APX, for the furnishing of allografts purchased from Company 1.

### The Medicare Program

8. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

9. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

10. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered, among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers, that were medically necessary and ordered by licensed medical doctors or qualified health care providers.

11. Physicians, nurse practitioners, group practices, and other health care providers (collectively, "providers") that provided items and services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

12. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name; (b) a description of the health care benefit, item, or

service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the ordering, referring, or rendering physician or other health care provider. The claim form could be submitted in hard copy or electronically via interstate wire.

13. As a requirement to enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, accurately documented, and provided as represented to Medicare. Medicare would not pay for items and services that were procured through illegal kickbacks or bribes.

14. Medicare covered access to certain bioengineered skin substitutes, including some amniotic membrane allografts made from human placental tissue ("allografts"). These allografts were applied over open wounds to assist with wound closure or skin growth. Medicare reimbursed providers for certain allografts furnished to Medicare beneficiaries only if the allografts were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, provided as represented to Medicare, and not procured through illegal kickbacks or bribes.

### TRICARE

15. TRICARE was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency ("DHA"), an agency of the DOD, was the governmental entity responsible for overseeing

and administering TRICARE.

16. TRICARE offered health insurance benefits for items and services that were medically necessary. TRICARE reimbursed providers based on payment rates from applicable fee and rates schedules. Generally, when a beneficiary was eligible for Medicare and TRICARE, TRICARE was secondary to Medicare.

17. TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

**Commercial Insurance Plans**

18. Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services. Individuals who received benefits from Commercial Insurers were referred to as "members."

19. Commercial Insurers often made payments directly to providers, rather than to members who received the health care benefits, items, and services.

20. To obtain payment for treatment or services provided to a member, providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically. The claim form required certain important information, including: (a) the member's name and identification number; (b) a description of the health care benefit, item, or service that was provided or supplied to the member; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the member; and (e) the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

21. When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, and complete, and that the form

- 5 -

was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and provided as represented.

22. Each of the Commercial Insurers was a "health care benefit program," as defined in 18 U.S.C. § 24(b), and affected interstate commerce.

## COUNT 1
## 18 U.S.C. § 1349
### (Health Care Fraud Conspiracy)

23. The factual allegations in paragraphs 1 through 22 are incorporated by reference and re-alleged as though fully set forth herein.

24. Beginning in or around July 2023, and continuing through in or around April 2024, in the District of Arizona and elsewhere, DAYLON BENNETT did knowingly and willfully combine, conspire, confederate, and agree with Alexandra Gehrke, Jeffrey King, individuals associated with Company 1, APX, Apex, and Viking, and other individuals and entities known and unknown to the United States, to execute a scheme and artifice to defraud Medicare, TRICARE, and Commercial Insurers, health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

25. It was the purpose of the conspiracy for DAYLON BENNETT and others, known and unknown to the United States, to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, and Commercial Insurers for items and services that were (i) medically unreasonable and unnecessary, (ii) ineligible for reimbursement, and (iii) procured through kickbacks and bribes; (b) concealing the submission of false and

fraudulent claims to Medicare, TRICARE, and Commercial Insurers and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of DAYLON BENNETT and his co-conspirators, and to further the fraud.

### Manner and Means

The manner and means used by Defendant DAYLON BENNETT and others, individually and through the entities described above, to effect the object of the conspiracy and scheme to defraud, included the following:

26. From approximately July 2023 through approximately August 2023, DAYLON BENNETT, as a medically untrained sales representative with Apex, identified elderly Medicare beneficiaries with a wound or wounds of any stage to which Company 1's allografts could be applied.

27. DAYLON BENNETT, based on his own assessment, ordered and arranged for and recommended the ordering of Company 1's allografts to be applied to the patients' wound(s). The allografts were procured through illegal kickbacks and bribes, medically unnecessary, and ineligible for Medicare reimbursement.

28. DAYLON BENNETT referred the patients that he identified to Jeffrey King and APX, who contracted with nurse practitioners to apply the allografts that DAYLON BENNETT ordered and recommended to be ordered. APX billed Medicare for the allografts applied to the patients and attendant services.

29. DAYLON BENNETT received unlawful kickbacks from Alexandra Gehrke and Apex based on the quantity and sizes of Company 1's allografts that the nurse practitioners applied to the patients and that APX billed to Medicare and TRICARE.

30. From approximately September 2023 through approximately April 2024, DAYLON BENNETT, as the Director of Sales for Apex and Viking, trained Apex and Viking sales representatives; authorized and directed Apex and Viking sales representatives to order and arrange for and recommend the ordering of specific sizes and

quantities of Company 1's allografts; conducted performance reviews with Apex and Viking sales representatives; and mediated conflicts with health care facilities that complained about APX, Apex, and Viking's involvement with their patients' medical treatments.

31. DAYLON BENNETT received unlawful kickbacks from Alexandra Gehrke, Apex, and Viking based on the total amount paid to APX by Medicare and TRICARE for Company 1's allografts that were ordered and arranged for and recommended to be ordered by all Apex and Viking's sales representatives.

32. From in and around July 2023 through in and around April 2024, DAYLON BENNETT received approximately $17,953,662 in illegal kickbacks from Alexandra Gehrke, Apex, and Viking in exchange for ordering and arranging for and recommending the purchasing and ordering of Company 1's allografts billed to Medicare and TRICARE, and directing and authorizing the same.

33. From approximately July 2023 through approximately August 2023, APX fraudulently billed Medicare approximately $11,134,800 for Company 1's allografts that DAYLON BENNETT ordered and recommended to be ordered that were applied by APX's nurse practitioners to Medicare beneficiaries. Medicare paid APX approximately $8,907,840 based on those claims.

34. From approximately September 2023 through approximately April 2023, APX billed Medicare, TRICARE, and Commercial Insurers approximately $759,603,166 for Company 1's allografts that were ordered and recommended to be ordered by Apex and Viking sales representatives under the management and supervision of DAYLON BENNETT and applied by APX's nurse practitioners. Medicare, TRICARE, and Commercial Insurers paid APX approximately $427,029,309.39 based on those claims.

///
///
///

**COUNT 2**
**18 U.S.C. § 371**
**(Conspiracy)**

35. The factual allegations in paragraphs 1 through 22 are incorporated by reference and re-alleged as though fully set forth herein.

36. Beginning in or around July 2023, and continuing through in or around April 2024, in the District of Arizona and elsewhere, DAYLON BENNETT knowingly and willfully agreed and conspired with Alexandra Gehrke, Jeffrey King, individuals associated with Company 1, APX, Apex, and Viking, and other individuals and entities known and unknown to the United States to: defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means the lawful government functions of HHS and CMS in their administration and oversight of Medicare, and DOD and DHA in their administration and oversight of TRICARE; and solicit and receive illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1).

**Purpose of the Conspiracy**

37. Paragraph 25 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the conspiracy.

**Manner and Means of the Conspiracy**

38. Paragraphs 26 through 34 are incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the conspiracy.

**Overt Acts**

39. In furtherance of the conspiracy, and to effect the objects of the conspiracy, DAYLON BENNETT committed or caused to be committed various overt acts in the District of Arizona and elsewhere, including but not limited to the following:

40. On or about August 17, 2023, DAYLON BENNETT received an illegal kickback and bribe in the form of a check in the amount of $123,768.00 that was drawn on Apex's bank account ending in 9686 and signed by Alexandra Gehrke, which he deposited into a bank account in the name of Solar Movement LLC.

41. On or about December 13, 2023, DAYLON BENNETT received an illegal kickback and bribe in the form of a check in the amount of $5,134,569.16 that was drawn on Apex's bank account ending in 9686 and signed by Alexandra Gehrke, which he deposited into a bank account ending in 9798.

42. On or about March 15, 2024, DAYLON BENNETT received an illegal kickback and bribe in the form of a check in the amount of $2,163,259.97 that was drawn on Viking's bank account ending in 1090 and signed by Alexandra Gehrke, which he deposited into a bank account ending in 9798.

All in violation of 18 U.S.C. § 371.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461; 18 U.S.C. § 982(a)(7))

43. The above allegations contained in this Information are hereby incorporated by reference as if fully set forth herein.

44. Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), together with Title 28, United States Code, Section 2461, as a result of the foregoing violations as charged in Counts 1 and 2 of this Information, DAYLON BENNETT shall forfeit to the United States: any property, real or personal (a) which constitutes or is derived from proceeds traceable to the commission of the offense, and (b) that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

45. Such property includes, but is not limited to, a forfeiture money judgment, in an amount to be proved in this matter, representing the total amount of proceeds and/or gross proceeds obtained as a result of the defendant's violations as charged in Counts 1 and 2 of this Information, and the property named below:

   a. The property at 4030 East Colter Street, Phoenix, Arizona 85018, titled to MAX OUT HOLDINGS LLC.

46. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

Title 18, United States Code, Section 982(b), DAYLON BENNETT shall forfeit substitute property, up to the value of the properties described above or identified in any subsequent forfeiture bills of particular, if, by any act or omission of the defendant, the property cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

Dated this 10th day of February, 2025.

GARY M. RESTAINO
United States Attorney
District of Arizona

*Digitally signed by MATTHEW WILLIAMS
Date: 2025.02.10 11:06:50 -07'00'*

Matthew Williams
Assistant U.S. Attorney

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND *Digitally signed by SHANE BUTLAND
Date: 2025.02.10 13:11:40 -05'00'*

Shane Butland
Trial Attorney